577 A.2d 1259

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. DONALD HAMM, DEFENDANT–APPELLANT.

Argued February 27, 1990—Decided August 6, 1990.

---

*Michael R. Speck* argued the cause for appellant (*Francis X. Moore,* attorney; *Michael R. Speck* and *Francis X. Moore,* on the briefs).

*Mark P. Stalford,* Assistant Prosecutor, argued the cause for respondent (*John Kaye,* Monmouth County Prosecutor, attorney).

*Linda K. Danielson,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

· *Brian J. Neary* argued the cause on behalf of *amicus curiae* Association of Criminal Defense Lawyers of New Jersey.

The opinion of the Court was delivered by

O'HERN, J.

The question in this case is whether a defendant, after having been twice convicted of driving while intoxicated (DWI) in violation of *N.J.S.A.* 39:4–50(a), has a constitutional right to trial by jury for a third DWI offense. We hold that the statutory penalties for DWI are not so severe as to clearly reflect a legislative determination of a constitutionally "serious" offense requiring jury trial.

I

Defendant was arrested for his third DWI offense on August 10, 1986. Prior to trial defendant moved for a trial by jury. The municipal court judge denied that motion, relying on *State v. Linnehan,* 197 *N.J.Super.* 41, 484 *A.*2d 34 (App.Div.1984), *certif. denied,* 99 *N.J.* 236, 491 *A.*2d 723 (1985), in which the court had ruled that a three-time DWI offender was not entitled to a jury trial, and accepted defendant's plea of guilty conditioned on the preservation of the pretrial motion for a jury trial. The court sentenced defendant, in accordance with *N.J.S.A.* 39:4–50(a)(3), to ninety days of community service, twenty-eight days in an inpatient program and sixty days in an outpatient program. The court fined defendant $1,000; imposed a surcharge of $100, *N.J.S.A.* 39:4–50.8, and $15 court costs; and suspended his license for ten years.

On defendant's appeal, the Law Division affirmed the trial court's denial of his motion for a jury trial, and the Appellate Division affirmed that judgment. We granted defendant's petition for certification. 117 *N.J.* 51, 563 *A.*2d 819 (1989).

## II

### A.

■ We begin by noting that the question is posed primarily as one of federal-constitutional right. That is because New Jersey has never recognized a right to trial by jury for the motor-vehicle offense of DWI. It is simply not a crime under New Jersey law.

> Persons charged with crime are constitutionally entitled to trial by jury. Those charged with petty offenses are not. *Duncan v. Louisiana*, 391 *U.S.* 145, 88 *S.Ct.* 1444, 20 *L.Ed.*2d 491 (1968). The New Jersey Supreme Court has held that the only reliable test for distinction is the severity of the authorized punishment, and that jury trial is not required unless the maximum penalty to which the defendant is exposed exceeds six months incarceration and a fine of $1,000. *State v. Owens*, 54 *N.J.* 153, 254 *A.*2d 97 (1969); *In re Yengo*, 84 *N.J.* 111, 417 *A.*2d 533 (1980). *See Baldwin v. New York*, 399 *U.S.* 66, 90 *S.Ct.* 1886, 26 *L.Ed.*2d 437 (1970). Where factually related petty offenses are tried together whose maximum sentences total more than six months, and the defendant is not offered a jury-trial, the sentences may not total more than six months. *State v. Owens, supra.* Concurrent jail sentences, each of which does not exceed six months, are permissible. *Id.* 54 *N.J.* at 163, 254 *A.*2d 97. [*State v. Linnehan, supra,* 197 *N.J.Super.* at 43, 484 *A.*2d 34.]

### B.

■ Our federal analysis centers on the United States Supreme Court's decision in *Blanton v. North Las Vegas*, 489 *U.S.* 538, 109 *S.Ct.* 1289, 103 *L.Ed.*2d 550 (1989). In that case the Court held that first-time offenders of the Nevada drunk-driving laws were not entitled to trial by jury. A first-time DWI offender in Nevada may face between two days and six months of incarceration or, in the alternative, forty-eight hours of community work while identifiably dressed as a DWI offender. In addition, the defendant must pay a fine ranging from $200 to $1,000, enter an alcohol abuse education program at defendant's own expense, and automatically forfeit his or her license for ninety days.

In *Blanton,* the Court traced the long development of the doctrine of the constitutional right to trial by jury, and summarized its general view that if the maximum sentence of incarcer-

ation for an offense is six months or less, society views that offense as "petty" and there is presumptively no right to trial by jury. 489 *U.S.* at 543, 109 *S.Ct.* at 1293, 103 *L.Ed.*2d at 556. *See generally* Note, "Drunk Drivers Have No Right to Jury Trial," 20 *Seton Hall L.Rev.* 600 (1990) (analyzing *Blanton*). That doctrine is based on a long history of non-jury trials of what were regarded as petty offenses in colonial courts. "[T]he common law, despite its veneration for the jury, always recognized a wide range of petty offenses which were tried summarily before a magistrate without the interposition of a jury." H. Kalven, Jr. & H. Zeisel, *The American Jury* 15 (1966).[1]

But the Court in *Blanton* considered as well the penalties other than incarceration imposed under Nevada DWI law, and concluded that taken in the aggregate the various fines, period of license suspension, and community service requirements did

---

[1]This history was summarized by (later Justice) Felix Frankfurter and Thomas Corcoran in a 1926 law review article:

Both in England and in the colonies a clear and unbroken practice—despite all uncertainties and reservations—emerges for two centuries preceding the Constitution. Many offenses were customarily tried solely by magistrates. These offenses were compendiously characterized as "petty." But pettiness was not a rigidly fixed conception; demarcation between resort to jury trial and its dispensation was not mechanical. In subjecting certain conduct to the summary procedure of magistrates, unguarded by the popular element, there was an exercise of moral judgment dividing behavior into serious affairs and minor misdeeds. The gravity of danger to the community from the misconduct largely guided the moral judgment; the wide repetition of the act, raising practical problems of enforcement, in part influenced the moral value which the community attached to the act. The apportioned punishment was both a consequence of the minor quality of the misconduct and an index of the community's moral judgment upon it. Broadly speaking, acts were dealt with summarily which did not offend too deeply the moral purposes of the community, which were not too close to society's danger, and were stigmatized by punishment relatively light. These general tendencies, both in England and in the colonies, represent the history absorbed by the Constitution. [Frankfurter and Corcoran, "Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury," 39 *Harv.L.Rev.* 917, 980–81 (1926).]

not make a first-time DWI conviction in Nevada a "serious" offense for sixth-amendment purposes. 489 *U.S.* at 545, 109 *S.Ct.* at 1294, 103 *L.Ed.*2d at 558. With regard to the possible $1,000 fine faced by a first-time DWI offender in Nevada, the Court indicated that that amount was "well below the $5,000 level set by Congress in its most recent definition of a 'petty' offense, 18 U.S.C. § 1 * * *." *Id.* at 544, 109 *S.Ct.* at 1294, 103 *L.Ed.*2d at 557.

The Court in *Blanton* recognized that there may be some offenses to which a legislature attaches such onerous penalties that sixth-amendment concerns may be implicated. Hence, the Court stated that although an offense with a maximum six-month sentence would presumptively not warrant a jury trial, yet in a "rare situation" if a "legislature packs an offense" by imposing other penalties in such a manner that it becomes "serious" without "punctur[ing] the 6–month incarceration line," a jury trial would be necessary. *Id.* at 542–43, 109 *S.Ct.* at 1292–93, 103 *L.Ed.*2d at 556–57. In the wake of *Blanton* the

Court has given no indication of what criteria it may invoke in the future to give content to the expression "serious." Nonetheless, these principles, which have remained unmodified, provide the analytical framework for resolving this case.[2] The question we must decide is whether the Legislature has so

---

[2]Along the way, the Supreme Court seems to have shed some outmoded doctrinal analysis of jury-trial rights. For example, in *District of Columbia v. Colts*, 282 *U.S.* 63, 51 *S.Ct.* 52, 75 *L.Ed.* 177 (1930), it viewed reckless driving of an automobile as *malum in se* (evil in itself), thus requiring trial by jury. Would anyone today seriously believe that a reckless driving charge demanded a jury of twelve? And on the score of social opprobrium or stigma (once a basis for jury trial because indicative of moral turpitude, *see Callan v. Wilson*, 127 *U.S.* 540, 556, 8 *S.Ct.* 1301, 1307, 32 *L.Ed.* 223, 228 (1888) (conspiracy requires jury trial because "offense of a grave character")), it seems that some people, unless they have themselves suffered the senseless violence that a drunk driver can inflict, maintain a moral ambiguity about the offense, at least when no injury or accident has occurred. Indeed, there are organizations that champion what they believe is the unfair treatment of drinking drivers. No, the constitutional answer will not be found under the labels of opprobrium or stigma.

"packed" the offense of DWI that it must be regarded as "serious" for sixth-amendment purposes.

III

A.

New Jersey's history and traditions with respect to DWI offenses convince us that however deliberately our Legislature has addressed the problem, it has yet to take that step that would transform a DWI offense into a constitutionally "serious" offense. This is not to say that our DWI laws are not tough. Indeed, Governor Kean described them as the "toughest in the nation." *Kelly v. Gwinnell,* 96 *N.J.* 538, 545, 476 *A.*2d 1219 (1984) (citing Governor's Annual Message to the N.J. State Legislature, Jan. 10, 1984). But he was obviously not referring to the criminal punishment that we inflict. Many states impose longer sentences of imprisonment than we. Many impose a one-year maximum, several a two-year maximum, for a first offense. *See* Note, "The Federal Constitutional Right to Trial By Jury for the Offense of Driving While Intoxicated," 73 *Minn.L.Rev.* 122 (1988) [hereinafter Note, "Jury for DWI"] (Appendix surveying state statutory penalties for first-time DWI violations). Some impose much longer sentences for repeat offenses. In Louisiana, for example, a fourth offender is subject to a mandatory ten years at hard labor, with a maximum thirty-year term of imprisonment. *La.Rev.Stat. Ann.* § 14:98. What Governor Kean undoubtedly had in mind was the ever-tightening grid of regulations that accompanied federal highway-safety requirements and rising public awareness of the social costs of drunk driving. Statistics indicate that nationally approximately 6,700 lives were saved in 1987 alone as a result of heightened efforts to rid the highway of drunk drivers. National Highway Traffic Safety Administration: Alcohol–Related Traffic Fatalities, 1982–1987.

Our judicial doctrines have reinforced these legislative changes at each step in the DWI-litigation process: the vali-

dation of the breathalyzer as the critical scientific test of blood alcohol (BAT) in establishing the offense, *Romano v. Kimmelman*, 96 *N.J.* 66, 474 *A.*2d 1 (1984); the rejection of individualized evidence that would undermine the BAT in trying such cases, *State v. Tischio*, 107 *N.J.* 504, 527 *A.*2d 388 (1987), *appeal dismissed*, 484 *U.S.* 1038, 108 *S. Ct.* 768, 98 *L.Ed.*2d 855 (1988), and *State v. Downie*, 117 *N.J.* 450, 569 *A.*2d 242 (1990); and the elimination of a mental-state requirement for the offense, *State v. Hammond*, 118 *N.J.* 306, 571 *A.*2d 942 (1990). In each of those cases we have recognized the social significance of DWI. We found that "[t]he primary purpose behind New Jersey's drunk-driving statutes is to curb the senseless havoc and destruction caused by intoxicated drivers * * * * [and] to eliminate intoxicated drivers from the roadways of this State." *State v. Tischio, supra*, 107 *N.J.* at 512 and 514, 527 *A.*2d 388.

Despite the fact that the Legislature regards DWI as a profound social problem, it has yet to impose the full force of law on that offense that would denote a social evaluation that DWI is a "crime" or an offense that equates with the need of trial by jury. The Legislature has yet to require a sentence in excess of six months, or even to require a mandatory six months of incarceration. It continues to address the problem with a measured response tempered by strong doses of rehabilitation and reparation.

In *State v. Laurick*, 120 *N.J.* 1, 5, 6, 575 *A.*2d 1340 (1990) we gave a brief but non-definitive summary of DWI penalties. All offenders must satisfy various educational and rehabilitative requirements and must pay enforcement and insurance surcharges. The escalating penalties that are the primary concern of this appeal are the fines, license suspensions, community service, and custodial terms imposed by *N.J.S.A.* 39:4–50, in brief:

|  | First Offense | Second Offense | Third Offense |
|---|---|---|---|
| Fine | $250 to $400 | $500 to $1,000 | $1,000 |
| License Suspension | six months to one year | two years | ten years |
| Community Service |  | thirty days | up to ninety days, resulting in reduction of imprisonment for equal number of days |
| Detainment or Incarceration * | up to thirty days; twelve to forty-eight hours at Intoxicated Driver Resource Center | forty-eight hours to ninety days | 180 days |

* Offenders may be sentenced to county jail or workhouse, inpatient rehabilitation program, or other facility approved by Director of Division of Alcoholism, Department of Health. First and second offenders may be sentenced to an Intoxicated Driver Resource Center.

---

Aside from the $1,000 fine (which the *Blanton* court would regard as "petty" for constitutional purposes) and the 180–day imprisonment, third-offense DWI penalties are civil penalties. Evidence that the Legislature views such penalties as qualitatively different from criminal penalties is their exemption from general statutory restrictions. The Criminal Code expressly distinguishes civil penalties, including suspension or cancellation of a license, allowing their imposition regardless of statutory limitations on criminal penalties that otherwise apply to non-criminal offenses such as motor-vehicle offenses. *N.J.S.A.* 2C:43–2d. Of course we do not disregard these civil penalties. We note only that they are not the penalties associated with crimes.

In contrast, when the New Jersey Legislature wants to treat an offense as "serious," there will be no mistaking it. When the Legislature became concerned with the prevalence of guns in our society, it directed that many routine offenses would

carry a mandatory three-year term of imprisonment if committed with a firearm. *N.J.S.A.* 2C:43–6c. And recently, in its Comprehensive Drug Reform Act, the Legislature provided mandatory prison sentences for the selling of drugs within one thousand feet of a school. *N.J.S.A.* 2C:35–7.

In addition, we have uniformly recognized that the DWI offense is in no sense to be regarded as a criminal offense under the laws of the State of New Jersey. In *In re Buehrer,* 50 *N.J.* 501, 517–18, 236 *A.*2d 592 (1967), we offered the following brief outline of what offenses do not qualify as "crimes":

> In our State "crimes" * * * are within our constitutional guarantees of indictment and trial by jury.

> Below the grade of crime are lesser offenses, none of which carries the stigma or the disabilities which follow upon a conviction of crime, * * * or authorized maximum penalties as severe as those which may be imposed upon a conviction for crime. Among the lesser offenses are "disorderly person" offenses which cover a wide gamut of misbehavior * * *. In addition there are other statutes providing for lesser offenses with still lower limits on punishment, such as the Motor Vehicle Act, and of course there are municipal ordinances as well. [Citations omitted.]

We recently reaffirmed in *State v. Hammond, supra,* 118 *N.J.* 306, 571 *A.*2d 942, that DWI is not a "criminal offense" as defined in New Jersey's Code of Criminal Justice. Hence, the culpability standards with respect to state of mind that ordinarily attend criminal offenses do not attend DWI offenses. Also instructive is our recent ruling that when the motor-vehicle offenses of careless driving and reckless driving are lesser-included offenses of the crime of death by auto, their determination is the province of the judge rather than the jury. *State v. Muniz,* 118 *N.J.* 319, 571 *A.*2d 948 (1990).

### B.

When it comes to evaluating whether DWI is constitutionally "serious" or "petty," "a page of history is worth a volume of

logic." Frankfurter and Corcoran, "Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury," 39 *Harv.L. Rev.* 917, 922 (1926) (quoting Justice Holmes in *New York Trust Co. v. Eisner*, 256 *U.S.* 345, 349, 41 *S.Ct.* 506, 507, 65 *L.Ed.* 963, 983 (1921)). This debate about trial by jury for DWI cases is far from new in New Jersey. Our Legislature has, for over fifty years, deliberately chosen a course of action intended to balance its concerns for the eradication of DWI with the practical realities of enforcing its regulatory provisions over the approximately five million drivers licensed by the State.

The history of *N.J.S.A.* 39:4–50 may be traced to the first New Jersey drunk-driving statute, enacted over eighty years ago. *L.* 1909, *c.* 127. That act, supplementing the Crimes Act, provided that a number of motor-vehicle violations, including driving "while in an intoxicated condition," constituted misdemeanors. Four years later, however, in an act supplementing the Disorderly Persons Act, the Legislature provided that anyone operating a motor vehicle on a public street or highway "while under the influence of intoxicating liquors" should be adjudged a disorderly person, and punished by imprisonment of not less than thirty days nor more than six months. *L.* 1913, *c.* 67.

The problem of contrasting characterizations of drunk driving in the 1909 and 1913 statutes was resolved by the then-high court in *State v. Rodgers*, 91 *N.J.L.* 212, 102 *A.* 433 (E. & A.1917). There the defendant, having been convicted in the Paterson recorder's court of a disorderly persons offense and sentenced to thirty days' incarceration based on DWI, argued that the 1913 statute was invalid because it provided for conviction of DWI, a misdemeanor under the 1909 statute, without indictment and trial by jury. Defendant also argued that because the offense constituted a public nuisance indictable at common law, the recorder lacked jurisdiction. The Court said

that although DWI may in fact make the driver guilty of a public nuisance, no such evidence was required to sustain the charge. When the charge was not of a common-law offense, the Court asserted, the admission of evidence that would allow conviction of a common-law offense would not alter the character of the offense as disorderly conduct, and thus would not deprive the recorder of jurisdiction. 91 *N.J.L.* at 217, 102 *A.* 433.

Four years later the Legislature downgraded DWI to a motor-vehicle offense, reaffirming and expanding the penalties in the 1913 law. *L.* 1921, *c.* 208, § 14(3), p. 665. The new motor-vehicle law provided for the same term of imprisonment plus forfeiture of driver's license for one year for a first offense, and five years for a subsequent offense. Previous acts relative to motor vehicles were expressly repealed at the same time. *L.* 1921, *c.* 184.

In 1925 a driver again challenged his DWI conviction by an Ocean County justice of the peace under the 1921 statute, claiming that the statute was contrary to the New Jersey Constitution because it provided for imprisonment without jury trial. *Klinges v. Court of Common Pleas,* 4 *N.J.Misc.* 7, 130 *A.* 601 (Sup.Ct.1925). The court again rejected the claim, referring to *Katz v. Eldredge,* 97 *N.J.L.* 123, 117 *A.* 841 (E. & A.1922) (discussing constitutional requirement of jury trials for prohibition-era penalties with up to six-month imprisonment), *clarified,* 98 *N.J.L.* 125, 117 *A.* 841 (E. & A.1922) (vote on jury issue short of majority of *Court*). In *Katz v. Eldredge,* Justice White, explaining the standard for invoking the right to jury trial, expressed what legal scholars Felix Frankfurter and Thomas Corcoran have called "a principle of persisting vitality":

[A]ssuming that the punishment will bear proper relation to the seriousness of the offence, the theory, as I understand it, which gave rise to the distinction at

common law and in subsequent statutes, is that the convenience and benefit to the public resulting from a prompt and inexpensive trial and punishment of violations of petty and trivial police power regulations are more important than the comparatively small prejudice to the individual resulting from his being deprived of the safeguard of indictment before having to answer and of trial by a jury when held to answer. [97 *N.J.L.* at 151, 117 *A.* 841 *quoted in* Frankfurter and Corcoran, *supra,* at 953.] 3

A 1926 amendment to the DWI statute altered the penalties by providing for a fine of not less than $200 nor more than $500 or imprisonment for not less than thirty days nor more than three months, or both, in the discretion of the magistrate, and a two-year loss of license. A second offense carried a mandatory penalty of three months' imprisonment and forfeiture of license to drive "thereafter." *L.* 1926, *c.* 152. Hence, between 1926 and 1952 second offenders faced mandatory three-month imprisonment and forfeited their licenses *permanently.* In short, at no time since 1913, spanning the time when our 1947 Constitution was adopted, did our history or traditions ever evidence a legislative determination to treat DWI offenses as indictable offenses.

The ten-year suspension was introduced in 1952. *L.* 1952, *c.* 286. Allowing license restoration for repeat DWI offenders reflected a downgrading of earlier social attitudes about DWI. Those pragmatic legislative judgments about how best to deal with DWI then turned to rehabilitation as a social goal. The

---

3*See also Latimer v. Wilson,* 103 *N.J.L.* 159, 134 *A.* 750 (E. & A.1926) (holding that DWI law did not unconstitutionally deprive defendant of right to trial by jury because right depends not on punishment imposed, but on character of statute and nature of offense, and DWI was non-indictable statutory offense); *Caruso v. Porter,* 102 *N.J.L.* 71, 130 *A.* 805 (Sup.Ct.1925) (finding no constitutional violation in 1921 DWI law because statutory offense may properly be subject to summary trial and punishment); *State v. Shaw,* 1 *N.J.Misc.* 82, 133 *A.* 536 (Sup.Ct.1923) (relying on *State v. Rodgers,* 91 *N.J.L.* 212, 102 *A.* 433 (E. & A.1917), when upholding constitutionality of non-jury trial for motor-vehicle offense of DWI).

1977 amendments, while mandating rehabilitation programs, differentiated penalties for second and third offenders, offered discretionary alternatives to imprisonment even for third offenders, and lowered the maximum license suspension to five years. *L.* 1977, *c.* 29, § 1.

The 1981 amendments, reflecting another shift in legislative attitudes, mandated community service and reinstated the ten-year suspension and mandatory imprisonment for third offenses. *L.* 1981, *c.* 537, § 1. Significant portions of that sentence may be noncustodial, however, because of the alternatives to incarceration available under *N.J.S.A.* 39:4–50(a)(3), and the availability of a work-release program and release from an inpatient to an outpatient program under *N.J.S.A.* 39:4–51. More recent legislation has established Intoxicated Driver Resource Centers, and has required every offender to complete an education program at a Center, reflecting increased emphasis on rehabilitation, education, and prevention. *L.* 1983, *c.* 444, § 1. During the same period several courts rejected demands for jury trials by DWI defendants. *See, e.g., State v. Linnehan, supra,* 197 *N.J.Super.* 41, 484 *A.*2d 34; *State v. Zoppi,* 196 *N.J.Super.* 596, 483 *A.*2d 844 (Law Div.1984); *State v. Ferretti,* 189 *N.J.Super.* 578, 461 *A.*2d 193 (Law Div.1983).

IV

A.

Although it is clear from this history that the punishment for a third DWI offense does not in any sense equate with the punishment for a crime, its "seriousness" must be analyzed today in light of the *Blanton* decision. Our sense of judicial fairness is not frozen in the past. Were it so, we might still see prisoners in stocks or public floggings for minor offenses that did not provide for a jury trial. *See* Frankfurter and Corcoran,

*supra,* at 950–51 (citing *Allinson Laws of New Jersey,* 403, 418 (1775), and the Disorderly Persons Act of 1799). No, the answer is not to look only to the past but to look as well to contemporary human values. As Justice Brennan recently stated, "All rules * * *, even ancient ones, must satisfy contemporary notions of due process." *Burnham v. Superior Court of California,* —— *U.S.* ——, 110 *S.Ct.* 2105, 2122–24, 109 *L.Ed.*2d 631 (1990) (plurality opinion).

In this light, we must then examine the various penalties imposed for a third DWI offense, on top of the potential six-month incarceration period and fines, in order to determine whether the offense is "serious" under *Blanton.*

### B.

When compared with the Nevada drunk-driving statute analyzed in *Blanton,* the most significant difference within our DWI law is the ten-year license-revocation period for a third offense. It is qualitatively distinct from all other escalating penalties in its jump from two to ten years for third offenders. At first glance it would appear not to be a penalty. After all, it is really a licensing function that could be administered quite apart from the municipal-court system. For now, we will treat it as part of the DWI "penalties," albeit civil. As noted previously, the United States Supreme Court dismissed Nevada's ninety-day license suspension for a first offense as insignificant for sixth-amendment purposes; however, it qualified its statement by indicating that it was particularly insignificant due to the fact that a restricted license could be obtained after forty-five days. *Blanton, supra,* 489 *U.S.* at 544 n. 9, 109 *S.Ct.* at 1293 n. 9, 103 *L.Ed.*2d at 557 n. 9. Thus it appears that the Court did not dismiss the idea of a license revocation as being "non-punitive"; rather, this particular period was viewed as insignificant due to its brevity.

Nor will we seek to trivialize the license revocation by an outworn distinction between rights and privileges. Anyone who thinks it is a governmental privilege to drive a car in New Jersey has only to experience the life of a suburban homemaker providing transportation for almost all of life's necessities, or the life of a salesperson trying to call on customers in far-flung shopping or industrial malls. A license to drive is not a privilege, it is nearly a necessity. And its deprivation is clearly a "consequence of magnitude." *See Rodriguez v. Rosenblatt,* 58 *N.J.* 281, 295, 277 *A.*2d 216 (1971).

But is there any evidence that this license suspension is the constitutionally "serious" penalty that requires a trial by jury? There are many valued licenses held by our citizens that will never enjoy a comparable guarantee of jury trial. A tavern owner may forever lose a license to sell wines and liquors at a place of business without more than an administrative hearing. A doctor, dentist, broker, or lawyer may, without a jury trial, similarly lose more valued privileges than driving. A casino operator might lose a multi-million dollar license to operate without a jury trial. Even the loss of such a valued license, much less the suspension of a license, invokes only the process required to assure a fair hearing. Would it not be anomalous that a temporary loss of a license to drive be given greater constitutional protection? After all, has not the third-time DWI offender proven not once, not twice, but three times, that he or she presently lacks the qualifications to drive safely in New Jersey?

And, as noted, the ten-year license suspension that was reinstated in 1981 does not in any sense reflect a significant escalation of the seriousness with which New Jersey's Legislature regards this offense, but rather a shifting social conclusion about what works best with DWI offenders. For long periods in our history this penalty was in existence. For other periods

in our history, revocation for a repeat offender was final. As nearly as we can determine, there was no reprieve, administrative or otherwise, from this total revocation. Hence, we cannot say that today's Legislature has "packed" this offense with onerous penalties that just avoid "punctur[ing]" the 6–month incarceration line." *Blanton, supra,* 489 *U.S.* at 543, 109 *S.Ct.* at 1293, 103 *L.Ed.*2d at 556–57.

The other civil penalties or administrative sanctions would not appear to offend the *Blanton* criteria. The various rehabilitation and enforcement surcharges are reasonable in themselves. *See State v. Zoppi, supra,* 196 *N.J.Super.* 596, 483 *A.*2d 844. "As for increased insurance premiums, these can as easily result from a couple of speeding tickets, or from a fender-bender or two never criminally prosecuted." *Landry v. Hoepfner,* 840 *F.*2d 1201, 1216 (5th Cir.1988) (en banc), *cert. denied,* 489 *U.S.* 1083, 109 *S.Ct.* 1540, 103 *L.Ed.*2d 844 (1989). The DWI surcharge was totally unrelated to any legislative intent to "pack" the DWI offense and came in as part of the New Jersey Automobile Insurance Reform Act of 1982, which created the Joint Underwriting Association (JUA). See *L.* 1983, *c.* 65; *N.J.S.A.* 17:29A–35b(2). It is not "punitive" for purposes of *ex post facto* analysis. *Clark v. New Jersey Div. of Motor Vehicles,* 211 *N.J.Super.* 708, 711, 512 *A.*2d 588 (App.Div.1986).

Finally, the limited collateral consequences of DWI reinforce the conclusion that it remains a constitutionally "petty" offense. *See Baldwin v. New York,* 399 *U.S.* 66, 69, 90 *S.Ct.* 1886, 1888, 26 *L.Ed.*2d 437, 440–41 (1970). Under New Jersey law, for example, a public official convicted of a crime of dishonesty, no matter how petty, will suffer a forfeiture of public employment, *N.J.S.A.* 2C:51–2a(1), and in some cases a loss of pension benefits. A petty offense such as the illegal possession of drugs, if it occurs during the course of employment, could equally cause such a forfeiture. In neither case

would there be a jury trial. *Cf. Moore v. Youth Correctional Inst.*, 119 *N.J.* 256, 574 *A.*2d 983 (1990) (discussing standards for forfeiture of employment). No such severe consequences attend a conviction of DWI. Granted, it is a bitter pill to be without access to an automobile for ten years, but it is equally true that that provision serves as well in the interest of public safety as in the interest of stigmatizing or punishing the defendant. *See In re Kallen*, 92 *N.J.* 14, 29, 455 *A.*2d 460 (1983) (purpose of Implied Consent Law providing for license suspension on refusal to take chemical breath test "is not to punish the driver but to protect the motoring public by removing the offending driver from the highways with reasonable dispatch"). One could never deny that the social stigma of shoplifting, for example, would be vastly greater, but we do not afford jury trials for that disorderly persons offense.

Our prevailing societal attitudes hold that proper responses to alcohol abuse are rehabilitative, not punitive. *See N.J.S.A.* 26:2B–21 (no right or privilege may be denied because of status as alcoholic or treatment for alcoholism); *Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 594, 538 *A.*2d 794 (1988) (alcoholism treated as disability rather than evidence of misconduct). In fact, the useful parallel legislative view of alcohol rehabilitation is that DWI convictions are erased after a period of good behavior. *See N.J.S.A.* 39:4–50(a)(3) (after ten-year lapse, second offense treated as first and third offense treated as second for sentencing purposes). In other words, there is an assumption that time will in some ways cure the problem of alcohol abuse. We have no way of judging how correct those legislative assumptions are. They seem to be reasonably based on human experience and we would not say that a legislature should not be free to make such a judgment.

The heart of the *Blanton* decision appears to require a value judgment on whether or not a state legislature had made its

DWI offense and penalties so onerous that the principles of the sixth amendment should require trial by jury as a constitutionally "serious" offense. That requires in turn some consideration of how the Legislature itself views the offense. We may presume that the Legislature is fully aware that a statutory maximum penalty greater than 180 days' imprisonment would invoke the right to trial by jury, and that its historic confinement to that limit in DWI statutes is intentional. In fact, the very language of the statute that calls for "at least 180 days" of confinement has been interpreted to mean "not more than 180 days" precisely to reflect what our courts have considered to be the undoubted legislative intention to continue to treat DWI as a motor-vehicle offense, not a crime. *State v. Linnehan, supra,* 197 *N.J.Super.* at 43, 484 *A.*2d 34 (citing *State v. Owens,* 54 *N.J.* 153, 254 *A.*2d 97 (1969), *cert. denied,* 396 *U.S.* 1021, 90 *S.Ct.* 593, 24 *L.Ed.*2d 514 (1970)).

## C.

Finally, the provision of jury trial on a DWI charge by the majority of other states does not suggest the same result in New Jersey. *State v. Nemesh,* 228 *N.J.Super.* 597, 607, 550 *A.*2d 757 (App.Div.1988) (citing Annotation, "Right to Trial By Jury in Criminal Prosecution for Driving While Intoxicated or Other Similar Offenses," 16 *A.L.R.*3d 1373 (1967)). The Fifth Circuit recently rejected the claim that under Louisiana law DWI is a "serious" offense requiring trial by jury. *Landry v. Hoepfner, supra,* 840 *F.*2d 1201. That court pointed out that because most states do not follow the "petty offense" doctrine, in those states entitlement to jury trial does not establish an offense as serious; in many states all offenses, or all traffic offenses, or all offenses subject to any custodial sentence entail jury trial. *Id.* at 1218. That court concluded that notwithstanding the award of jury trials for DWI in the majority of

states, that same majority "classifies DWI in a manner which meets the standards of the [United States] Supreme Court's definition of 'petty.'" *Id.* at 1219.

Nor do we adhere to our "petty offense" classification out of a wish to avoid the administrative burden of additional jury trials. As noted, the great majority of jurisdictions provide jury trials for DWI offenders, *see id.* at 1217–19, presumably coping with the consequent demands on their court systems. In the case of third-DWI-offenders, preliminary statistics from the Division of Alcoholism in the Department of Health indicate that yearly there would be approximately 2,000 potential jury trials. It would be a burden, but it could well be less than projected. In many cases breathalyzer measurements will encourage pleas or waivers. *See* Note, "Jury for DWI" at 152 (administrative problems not significant because throughout country most DWI defendants plead guilty or waive right to jury trial). We recognize that DWI trials require care. They are not, or never should be, rushed. We were informed at oral argument that judges have special calendars for handling them. *See State v. Gallegan,* 117 *N.J.* 345, 567 *A.*2d 204 (1989). Expediency is not our guide.

## V

In sum, we believe that although the Legislature may regard DWI as a profound social problem based on its potential threat to public safety, the statutory penalties do not signal the Legislature's intent to treat DWI as the functional equivalent of a crime. Attainment of the "6–month incarceration line," *Blanton, supra,* 489 *U.S.* at 543, 109 *S.Ct.* at 1293, 103 *L.Ed.*2d at 557, is not the automatic product of a third DWI offense under New Jersey's law. The law allows for various alternatives to incarceration, with a strong emphasis on community service and rehabilitative alternatives. It is not without signifi-

cance that the statistical data that we have on repeat DWI offenders come from the State Department of Health, which operates the Intoxicated Driver Program Unit within its Division of Alcoholism. *See N.J.A.C.* 8:66A–1.1 to –9.5. The ten-year license suspension for third offenders, although in itself a heavy burden, is both precautionary and penal. No other loss of privilege, franchise, or right of citizenship flows from a DWI conviction.

The legislative and judicial history of DWI in New Jersey shows both its consistent treatment as a non-criminal offense and progressive legislative emphasis on rehabilitation and prevention rather than punishment alone. We have described this legislative response as one to a "societal dilemma," *State v. Tischio, supra,* 107 *N.J.* at 514, 527 *A.*2d 388, as to a sickness rather than a sin. Absent, then, clear constitutional requirement, reclassification of DWI as an offense to which trial by jury may attach should properly be by legislative, rather than judicial, judgment. The *Blanton* Court cautioned that "[t]he judiciary should not substitute its judgment as to seriousness for that of a legislature * * *." 489 *U.S.* at 541, 109 *S.Ct.* at 1292, 103 *L.Ed.*2d at 555.

A longer retrospective view reveals that those who shaped our institutions and secured for us the constitutional guarantee of trial by jury always realized that drawing the line between "petty" and "serious" offenses left a "margin for legislative discretion." Frankfurter and Corcoran, *supra,* at 979. In demarcating the offenses requiring jury trial,

we reach the everlasting enigma in law and in life: When is far too far? But we need not be "troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law...." [*Id.* at 981 (quoting Justice Holmes in *Irvin v. Gavit,* 268 *U.S.* 161, 168, 45 *S.Ct.* 475, 476, 69 *L.Ed.* 897, 899 (1925)).]

In this business of drawing lines, we claim no monopoly on constitutional wisdom. Other courts have concluded that DWI

is a serious offense requiring jury trial. *See, e.g., Richter v. Fairbanks,* 903 *F.*2d 1202 (8th Cir.1990) (jury trial required under *Blanton* when maximum imprisonment six months but $500 fine and fifteen-year driver's license revocation also mandated); *United States v. Craner,* 652 *F.*2d 23 (9th Cir.1981) (jury trial required when defendant faced possible six-month imprisonment and $500 fine under federal law, and six-month license revocation under state law); *State v. O'Brien,* 68 *Haw.* 38, 704 *P.*2d 883 (1985) (jury trial required despite six-month limit on imprisonment because mix of punishments signaled seriousness). It may be that the Supreme Court will draw a bright line to guide states in DWI cases. *Blanton* now appears to embrace a spectrum of values, a continuum rather than a clear contrast: the closer the DWI system actually comes to the six-month incarceration line, the less room there may be for other penalties. For now, given the rehabilitative emphasis in New Jersey's DWI laws (Hamm will serve no county-jail time; his sentence is split between community service and rehabilitation), we find the *Blanton* criteria not to be violated. It is not an easy question, but then neither is the underlying problem of how to handle DWI cases. That problem has been with us since the dawn of the automobile age. It will end when that age ends.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—None.